ELLEN C. HUNTON ET AL. v. E. B. NICHOLS ET AL.

(Case No. 2628.)

1. ADMINISTRATOR'S SALE.— In 1845 an administrator applied for the sale of land of the estate, which was ordered to be sold by the probate judge, by an order entered by him in vacation. The sale was in vacation, by an order entered by the probate judge, decreed to

be approved and confirmed, and that the administrator make title to the purchaser. *Held,* that the decree was an utter nullity, which could not serve as a foundation upon which to build up title in the purchaser.

2. PRACTICE.— It is the duty of the court to determine the legal effect of proceedings in administration affecting title, and to instruct the jury as to the regularity of a valid administrator's sale.

3. LIMITATION — HUSBAND AND WIFE.— The eleventh (11th) section of the act of January 20, 1840, was intended to apply to illegal sales of the wife's property, made by the husband during coverture, and to such sales only.

4. LIMITATION — TACKING DISABILITIES.— In avoiding the statute of limitations, successive or cumulative disabilities cannot be regarded; minority cannot be tacked to coverture, and the saving of the statute is only to those to whom the right first accrues.

5. LIMITATIONS.— The absence of a defendant from the state, or the absence of any vendor through whom he claims, can, in trespass to try title, when he invokes the statute of limitation for his protection, have no effect upon his rights, if, during the period of absence, possession was held by his tenant or agent.

6. LIMITATIONS.— The fact that the deed under which a defendant who invokes the five years' statute of limitations claims does not convey a good title to the land, does not prevent it from being such a deed as he may avail himself of with the other incidents which the law prescribes as a defense, under the five years' statute of limitations.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

The opinion states the case.

*G. R. Freeman* and *Sheeks & Sneed,* for appellants.

*Hancock, West & North,* and *C. I. Evans,* for appellees.

I. We submit that the court then had the power to order this sale, and could exercise it at a time other than the regular term time, and which the unskilled official designated perhaps as "in vacation." But who can say now that the act was not in fact performed at a special term of the court, which he called in vacation? It is no answer to this to say, that, before a special term could thus be held, certain advertisements had to be made.

Who at this distant day, and in the mutilated, dismembered and confused condition of the old probate papers, can say that these advertisements were not made, or that the special court was not held ?

II. Inasmuch, therefore, as the court had general jurisdiction over the subject matter, and had lawfully acquired it over this particular estate, we think that it cannot now be said that these acts were wholly without authority, simply because they appear not to have been done at a regular term of the court.

III. Again, even if the order was not entered either at a regular or special term, we do not believe, under the existing laws, that it was necessarily void.

IV. The duties of the officer under the laws at that early day are not clear, and that the construction we contend for was put upon them at that time by the officials of the former government, whose duty it was to act under them, and that whether that construction be correct or not, it should at this distant day be upheld in favor of innocent purchasers in possession. In Baker *v.* Coe, 20 Tex., 436, Mr. Justice Wheeler intimates that an ancient sale, even without the production of the order, might be upheld in favor of an innocent purchaser in possession for value and in good faith.

V. Under all the evidence we think that the court below was correct in declining absolutely, of itself, without the intervention of a jury, to decide that this sale was made in vacation, and in submitting all the evidence as to whether it was really made in accordance with law to the jury.

VI. It is well known to this court that from 1836 to 1848 the proceedings of these courts in Texas were very irregular, and that we, in fact, had then no regular well-digested probate system. Further, at that early date, that system, such as it was, and the conflicting laws in force, were in a great measure unknown to the officers, and the

records were all kept with the greatest carelessness. This court has frequently called attention to this state of affairs in sustaining probate sales made in the days of the republic. Lynch v. Baxter, 4 Tex., 444; Lessee of Coombs and Ewing v. Lane, 4 Ohio, 129; Bayne v. Garrett, 17 Tex., 334; Townsend v. Munger, 9 Tex., 300; Fishback v. Young, 19 Tex., 515; McCown v. Foster, 33 Tex., 241; Poor v. Boyce, 12 Tex., 450; Howard v. Bennet, 13 Tex., 309; Dancy v. Stricklinge, 15 Tex., 557; Soye v. McAllister, 18 Tex., 81; Soye v. Maverick, 18 Tex., 100; Alexander v. Maverick, 18 Tex., 179; Bartlett v. Cocke, 15 Tex., 479; Allen v. Clark, 21 Tex., 404; McGreal v. Jones, 36 Tex., 673; Kegans v. Allcorn, 9 Tex., 25; Jones v. Huff, 36 Tex., 678; Hudson v. Jurnigan, 39 Tex., 585; Withers v. Patterson, 27 Tex., 491; Davis v. Wells, 37 Tex., 607; Wells v. Polk, 36 Tex., 121.

VII. The eleventh section of the marital rights act of 1840 was limited to cases which might occur of an illegal sale by the husband of the wife's separate property during coverture. And if this be not its original meaning, then, in order to give full effect to the general law of limitations of the 5th of February, 1841, it must be construed in subordination to that general law, and where repugnant to the latter it must yield to it as the last expression of the legislative will upon the subject. If we are not mistaken in the view we have taken of the statute, then the court in its charge laid down the law correctly, as applied to the facts of the case, as is conceded by the appellant's counsel; for the hostile possession commenced during the coverture of Mrs. Kerfoot, and at her death, unless the disability of infancy be tacked to that of coverture, the statute must have commenced to run. The following authorities are full on the point: White v. Latimer, 12 Tex., 62; Sawyer v. Boyle, 21 Tex., 39; Thompson v. Cragg, 24 Tex., 588; McDonald v. McGuire, 8 Tex., 365; Ford v. Clements, 13 Tex., 597; McMasters

*v.* Mills, 30 Tex., 591; Doe *v.* Warren, 6 Mass., 328; Melvin *v.* Proprietors, etc., 16 Pick., 161; Caldwell *v.* Thorp, 8 Ala., 254; Rhodes *v.* Smithhunt, 4 M. & W., 42; Rhodes *v.* Smithhunt, 6 M. & W., 351; Mitchell *v.* Berry, 1 Met. (Ky.), 602.

VIII. We respectfully submit that by the terms of the very act invoked by the appellants they are not entitled to any of the benefits which its eleventh section is supposed to confer. It has been frequently held that nonresident married persons were not entitled to the benefits of our homestead law. Trawick *v.* Harris, 8 Tex., 312; Jordan *v.* Godman, 19 Tex., 275; Alston *v.* Ulman, 39 Tex., 158.

QUINAN, J. COM. APP.— This suit was instituted on March 23, 1873, in trespass to try title, by the children of Hamil E. Kerfoot, who, it is alleged, was the sole heir of David K. Webb, deceased, against E. B. Nichols, Sprague and Brush, for the recovery of an undivided half of a piece of land in lots 11 and 12, in block 69, in the city of Austin, and praying partition, etc. In the progress of the suit, it was dismissed as to the defendants Nichols and Sprague.

David K. Webb and William S. Beatty were, in 1842, when Webb died, partners, and owned as such the lots 11 and 12. Beatty was appointed administrator of the estate of Webb by the probate court of Travis county. Webb died unmarried. Mrs. Kerfoot, then a married woman, was his sole heir.

On the 8th of September, 1845, Beatty, the administrator, presented a petition to the probate judge, J. M. Long (addressed to the Hon. Probate Court), representing that he was desirous of a division of the lots, in order that he might be enabled, in closing the succession of Webb, to " render to your court specifically the interest of him, the said Webb, or the value thereof, in the prop-

erty." He alleged that the property could not be divided in a manner beneficial to him or the estate, and prayed a sale of it.

On the same day, on this petition, the probate judge made his order, which is entitled, "Probate Court — Travis County. In vacation, September 8, 1845," appointing appraisers to examine the property and report "whether it could be divided, or whether the same should be sold."

On the same day, the appraisers reported that in their opinion the property could not be divided without injury.

On the same day, J. M. Long, the probate judge, made an order which is entitled, "Probate Court — Travis County. In vacation, September 8, 1845." This order recites the previous action, and proceeds to decree that the administrator sell the interest of Webb in the property on the first Tuesday in October, 1845, and is signed "J. M. Long, Judge Probate." Afterwards, Beatty, the administrator, reported to the judge that he had sold the property to George Hancock, for $500, on the day named, "according to law."

On the 10th of October, 1845, the probate judge, upon this report, made an order which also is entitled, "Republic of Texas — County of Travis. Probate Court, Travis County. In vacation, October 10, 1845." This order recites the return of the proceedings and sale made, and decrees that the sale be approved and confirmed and that the administrator make title to the purchaser. It is signed "James M. Long, Judge Probate."

On the same 10th of October, 1845, Beatty, administrator, conveyed the property to George Hancock, reciting in his deed the application to the probate court *in vacation* for the sale, and the sale and approval of it, referring to the records of the probate court; and on the next day George Hancock reconveyed the property to Beatty.

Under these proceedings the defendant claimed title to

the property in controversy, and the validity of this sale was a principal question in the case.

The plaintiffs requested instructions to the jury to the effect that these proceedings and sale were void. 1. Because the orders of the court were made in vacation, and for other causes not necessary to notice. These instructions were refused.

The charge of the court directed the jury to find whether the sale made by the administrator was made according to law, and if so, to find for the defendant. There is nothing in his charge instructing them as to the law governing the subject.

The verdict of the jury was for the defendant. Were the proceedings and the sale valid? It is conceded they were irregular; are they void?

By the law in force at the time, the jurisdiction in matters of probate and the settlement of successions were committed to the probate court. The probate court was composed of the chief justice of the county court. The terms of the probate court were fixed by law. They were to be held at the court-house of the respective counties on the last Monday of every month in the year, and could continue from day to day until the business was disposed of. Special terms could be held for the transaction of business after public notice given of ten days of the time of holding.

On the 5th of February, 1840, a general law was enacted, entitled "An act regulating the duties of probate courts and the settlement of succession." This law, at some length, prescribes the course of procedure in such courts. Manifestly it was intended to supply the need created by the meager legislation before them of the congress upon the subject, and to furnish rules for the guidance of courts, judges and parties in the administrations of estates. It declares what the probate court may do in the specified cases. It defines also what the chief jus-

tices may do in particular cases. It repeals all laws contrary to its provisions.

Among those acts the court may do are these: To order the sale of land for the payment of debts; to make partition of estates and between part owners; and to order the sale of property, if it becomes necessary to effect partition.

Among the acts which the chief justice may do it is said, "besides presiding in the probate court in term time, he is empowered to take, receive and audit all accounts, etc.; to receive wills exhibited for probate, applications for administration, inventories and appraisements; to cause all citations and other necessary process returnable to the next term of said court;" "to examine and audit said accounts, causing them to be properly stated, and report them for allowance to the next term of the probate court."

But there is not in the seventy-two sections which compose this statute, a line or syllable from which can be deduced any power or authority in the chief justice, as such, to make partition of estates or decree the sale of lands in vacation. Hart. Dig., arts. 253, 252, 235, 1019, 1031, 1036, etc.

This power is conferred upon the probate court. It is the highest attribute of its jurisdiction. Its exercise requires the hearing of proofs, the determination of rights and interests, and its judgment may involve the whole mass of the estate or property upon which it is exercised. "All courts shall be open."

It is with us inherent in the very conception of a court, that its sessions shall be publicly held; that what it does shall not be done in a corner. And hence it is that time, and place, and terms, are prescribed for its sessions by law.

And a court cannot lawfully hold its sitting at any other time or place. "Judgments or decrees rendered out of

term time are simply void "—they are utter nullities. Hodges *v.* Ward & Ingram, 1 Tex., 244; Crosby *v.* Houston, 1 Tex., 203; Womack *v.* Womack, 17 Tex., 2; Freeman on Judgments, 121.

Was the decree for the sale of the land in this case so rendered? That fact appears upon its face. It is recited in the conveyance under which the appellees claim.

But it is insisted for the appellees, that although this fact so appears upon the face of the proceedings, we are at liberty to presume that it is not in fact true; that by the term "vacation" is meant a "special court"—not a regular term.

There are two answers which may be made to this suggestion.

1. The rule of law is, "that where the record is silent as to what was done, it will be presumed that what ought to have been done was not only done but rightly done. But when the record states what was done, it will not be presumed that something different was done." Hahn *v.* Kelly, 34 Cal., 407.

2. Such a presumption would do violence to plain English and common sense. Large as are the allowances which ought to be made for the ignorance of the persons called to administer the inferior judicial offices in those days, it would be quite too great a concession to presume that a judge of the probate court was ignorant of the meaning of the term "vacation," and that in using it, he meant to express the idea that he was then sitting in open court at a regular or special term of the court.

Again it is said, that if in fact these orders of sale were made in vacation, if afterwards the probate court in term time approved the sale, the regularity of its action after so great lapse of time could not be inquired into. What might be the judgment of the court in such case it is needless to speculate, for there is no proof tending that way. If the sale were to be held good, it would not in

any degree be because of the previous orders of the court, but would result from the decree approving it. We are not at liberty to presume that, because these orders were void, the probate court subsequently made its decree validating them; that from the act of the judge without jurisdiction, we may infer the subsequent act of the probate court upon the subject matter within its jurisdiction. How this sale was made, and when it was made, the transcript from the probate court shows, and the deed to the purchaser recites. It is affirmatively shown that it was made under a void decree. We can indulge in no presumption that it was made under any other decree or at any other time or place, or that any decree was made by competent authority to validate it.

We conclude that it was an utter nullity; that it could not serve as the foundation upon which to build up title in the defendant.

The refusal of the court to so instruct the jury is assigned for error, and in our opinion it was error. It was the duty of the court to determine the legal effect of the proceedings offered in evidence, and to instruct them as to the requisites of a valid sale. They were left for themselves to determine the law of the case. And as they found for the defendant, and we cannot say that their verdict may not have been the result of an erroneous view of the law of the case taken by them, the judgment founded upon it should be reversed, though the facts of the case as disclosed by the testimony might have well warranted, upon other grounds, a finding for the defendant.

The rulings of the court upon the law of limitation are also assigned for error, and, in view of another trial of the case, it is proper we should consider them.

The appellants insist that the charges given by the court as respects the limitation of three, five and ten years, as prescribed by the general law of limitation,

were not applicable to the case; that the law of limitation which regulates the rights of the parties to this controversy, is that prescribed by the eleventh section of the act of January 20, 1840, "to adopt the common law of England, to repeal certain Mexican laws, and to regulate the marital rights of parties." That section reads: "That if, during the coverture, a sale of the lands or slaves of the wife be illegally effected, no limitation shall commence to run during the coverture; and should the wife survive the dissolution of the marriage, she may sue for and recover such property; should the wife survive the dissolution, but not the time allowed by the law of limitations, then the running of such law shall cease until all the children of the deceased mother shall have arrived at the age of majority, or those under that age shall have married; and the heirs of the wife shall have the unexpired time allowed by the law of limitations within which to institute their suit for the recovery of said property; and if the wife shall not survive the dissolution of the marriage, the law of limitations shall not commence running, as to the children of the deceased mother, until all the children shall have arrived at the age of majority, or those under that age shall have married."

Mrs. Kerfoot died on the 16th of July, 1851, during the existence of her marriage. The plaintiffs, her children, were at her death all minors.

The plaintiffs contend that no law of limitation began to run against them until the arrival at age or the marriage of all the children, and that in this case the plaintiffs are not subject to the operation of the general law of limitations of 1841.

We have little hesitation in saying that this proposition is not sound. The object intended to be served by the insertion of this eleventh section of the act referred to, is, we think, rendered sufficiently obvious from a consideration of the provisions of the whole act and the circum-

stances under which it was enacted. We were about to introduce the common law of England in place of the old law of the land, which to our then and anticipated population was written in an unknown tongue. The common law with all its excellencies was believed to bear more harshly upon the marital rights of women than suited the generous spirit of our people. By that law the husband was "baron," and the wife "couvert." It delivered over the wife with her property to the husband as her lord and master. It was thought proper that, at the very outset of introducing this system, the rigor of it should be mitigated, and hence the propriety of providing in the same law safeguards for the protection of the wife from the absolute merger of her rights of property in the husband. And so it defines what are her rights of property; what her interests in the acquisitions made during the marriage; how she is entitled to support out of the proceeds of her separate property; how she may sue with or without her husband for the recovery of her effects, and what shall descend to her children. Every section of the law has direct reference to the rights and duties as respects the married parties to and with each other and their children.

By the general law, as against others than her husband the wife was protected from loss of her rights to property from the lapse of time, by her coverture, and so were her children, if infants, by their minority. The interest, also, of the husband in the property of the wife, and in the welfare of his children, was assurance that, as against the wrongs of others, he would protect their property. What was needed was a provision of the law to protect them against his own illegal sales. His power over his wife, his power over his children during their infancy, might deter them or others from the assertion of their rights against him. The fair inference, then, is, that this eleventh section was intended for this

emergency. It applies to *sales* only; the transfer of the apparent title to the thing; for any other disposition of the property, its letting or its use, was absolutely within the power of the husband. He has a right to the possession of the property. He is clothed with the *indicia* of ownership of the personalty. He may be tempted to sell it. It was against this sale that remedy was sought. But in respect to the sale or transfer of the property of the wife by strangers, the application of this statute would present a singular anomaly. Why should it be thought necessary to preserve to the children of the wife the right to sue until the youngest came of age or married, when during the life-time of the mother a stranger had sold her property, and yet remit the preservation of their right in it to the protection of the general law of limitations, when, without sale, the property is taken or trespassed upon by strangers? This would be to hold the broad shield of the statute of limitations over the naked trespasser or tortfeasor, and deny its protection to the innocent purchaser; to him who, perhaps, for full value and in good faith, had acquired possession of the property through a *sale*. Such could not have been the intent of the law-makers. The fair construction of the law is, that it was intended to apply to illegal sales by the husband, and that only. There was therefore no error in the refusal of the judge to give the instruction asked.

But there was error in the charge "that the right of action accrued to the mother of the plaintiffs during her coverture."

When the right of action accrued was the very matter at issue. It was a question for the jury, and it was invading their province to take the determination of that question from them. The proof shows the death of Mrs. Kerfoot on the 16th of July, 1851, and the building of a house by Jones on the property in controversy during that year; but which event first occurred is neither

way indicated by any preponderance of testimony. Jones' deed was recorded on the 29th of June, 1850. When did he take possession; or when did his vendors take possession under the deeds; or what was the character of the possession previously held by others of this property? The answer to these questions goes a great way to the determination of this controversy.

Unquestionably, if adverse possession of the property was taken previous to Mrs. Kerfoot's death, the defense of minority or coverture against the bar of the statute will not avail the plaintiffs. Their minority cannot be tacked to her coverture. The saving of the statute is only to those to whom the right first accrues. Successive or cumulative disabilities are of no avail. This is the settled construction of statutes of limitation; otherwise, statutes intended for the repose and peace of society by these saving clauses of coverture and minority, by an opposite construction would have the effect of defeating the benign object of such laws; and so, as it is said, "a right might travel through minorities for centuries." Angell on Limitations, and the cases cited, 489.

It remains very briefly to notice other propositions advanced by the appellants.

1. The absence of the defendant, or the absence of any vendor under whom he claims, from the state, has no effect to prevent the running of the statute in his favor. It is the possession of the land by himself or tenants, not his personal presence, which avails him.

2. The fact that his deed, or that of any of his vendors under whom he claims, does not convey a good title to the land, does not prevent it from being such deed·as he may avail himself of with the other incidents which the law prescribes as a defense under the five years' limitation. See Wofford v. McKinna, 23 Tex., 36; Flanagan v. Boggess, 46 Tex., 331; Whitehead v. Foley, 28 Tex., 268; Charle v. Saffold, 13 Tex., 94. Tested by themselves,

neither the deed to Horan, nor from Horan to Jones, or the conveyances to Brush, are void deeds.

3. The appellees suggest that there is nothing in any event to be gained by the appellants in prosecuting this appeal; that T. J. Kerfoot is a party in interest, who, if the appellants have any claim, shall be a plaintiff with them. That fact may be true, but we cannot undertake to say it is. But if it be admitted that he is a tenant in common with the appellants, it does not follow that they could not recover in this suit such interest as they may establish they have. Of course they could not have partition without making all the parties in interest parties in the suit.

This disposes of all the material questions presented in the briefs of counsel.

For the most part, the assignments of error are so general that we might well decline to consider them.

It is our opinion that the proper disposition of this case is to reverse and remand it.

REVERSED AND REMANDED.

[Opinion delivered May 10, 1881.]